## THE STATE v. GIBSON, *Appellant.*

### In Banc, June 20, 1892.

1. **Criminal Law**: ABDUCTION OF FEMALE: CONCUBINAGE. Cohabiting with a female for a single act of sexual intercourse is insufficient to constitute "concubinage" under Revised Statutes, section 3484, making it a felony to take away a female under eighteen years of age for the purpose of prostitution or concubinage. [*Per* SHERWOOD, C. J., BRACE and GANTT, JJ., *concurring.*]

2. ——: ——: ——. The meaning of the words "concubinage", and "prostitution" considered and discussed. [*Ibid.*]

3. ——: ——: ——: INDICTMENT. A count of an indictment which charges three men with abducting a female for the purpose of concubinage by having intercourse with them charges no offense, as she could not be the concubine of all three. [*Ibid.*]

4. ——: ——: ——. The evidence in this case examined and *held* insufficient to support a conviction for the abduction of the female for the purpose of concubinage.

5. ——: ——: ——. An unchaste girl is not within the protection of the statute. [*Per* SHERWOOD, C. J. See *Town v. State*, 20 Atl. Rep. (Md.) 140.]

*Appeal from Harrison Circuit Court.*—HON. C. H. S. GOODMAN, Judge.

REVERSED.

*J. W. Peery, J. C. Wilson, J. M. Sallee* and *McCullough & Peery* for appellant.

(1) The court should have sustained the demurrer to the evidence, there being no evidence of conspiracy, and the witness, Ada E. Dyche, testifying that she requested the appellant to take her away, and that he never at any time solicited her to leave her father's home; he was guilty of no crime in taking her, and the mere act of illicit intercourse on the road that night

cannot make that a crime which would not otherwise
be. If she came to him and requested him to take her
away for a legitimate purpose, as she insists she did, he
did not commit a crime in receiving her, providing he
had not previously attempted to induce her to go with
him. *State v. Gibson*, 108 Mo. 575; Kelley's Crim-
inal Law, sec. 517; 2 Archbold on Criminal Prac-
tice & Pleading, 149; *Carpenter v. People*, 8 Barb.
603. There must be enticement by the defendant to
constitute this offense. *Lewis v. People*, 37 Mich. 518;
*State v. Crawford*, 34 Iowa, 40; *Wilson v. State*, 58 Ga.
328; *People v. Plath*, 100 N. Y. 590. (2) The court
erred in excluding evidence offered by defendant of
specific acts of unchastity with other men prior to
the alleged abduction. The statute was intended
to protect chaste and virtuous girls, and not those who
are already prostitutes. Hence, if this girl had been
leading a life of shame prior to this time she could not
be said to have been drawn aside from the path of
virtue by the defendant. *State v. Patterson*, 88 Mo.
88; *State v. Wheeler*, 94 Mo. 252; *State v. Primm*, 98
Mo. 368. (3) The second instruction given for the
state was erroneous. (4) The second count of this
indictment is bad, because: *First*, it charges three men
with taking away a female for the purpose of concu-
binage, by having illicit intercourse with them and
each of them, and divers other men to the jurors
unknown; *second*, it fails to allege that the purpose or
intent with which she was taken was felonious, or that
the act was done with a felonious intent or purpose;
*third*, it fails to allege that the purpose of defendant
was to cohabit with her in sexual commerce, without
the authority of law or a legal marriage. (5) The
second count contains not a single allegation descript-
tive of, or which could apply to, the offense of abduc-
tion for the purpose of concubinage, and, hence, the

judgment should have been arrested for that reason. *State v. Goodwin*, 33 Kan. 538; *Osborn v. State*, 52 Ind. 526; 1 Bouvier's Law Dictionary, p. 353; 2 Bouvier's Law Dictionary, 481; Bishop on Criminal Procedure [2 Ed.] secs. 482, 483, 485, 490.

*John M. Wood*, Attorney General, for the State.

(1) The evidence tended to show that the defendant and his father and brother had combined and entered into a common undertaking to take away Ada Dyche from her father for the purpose of concubinage, and that, in pursuance of such combination and common undertaking, they did take her away for that purpose. It was not necessary that the declarations and conduct of the father and brother should have been in the presence and hearing of the defendant in order to be admissible against him. *State v. Walker*, 98 Mo. 95; *Anarchist case*, 12 N. E. Rep. 980; *Card v. State*, 9 N. E. Rep. 591. (2) The evidence in this case was sufficient to warrant a conviction, and the demurrer thereto was properly overruled. *State v. Round*, 82 Mo. 679; *State v. Feasel*, 74 Mo. 524. (3) The second instruction for the state properly defined the word "concubinage." (4) The indictment follows the language of the statute, and is sufficient. Kelley's Criminal Law, sec. 515.

SHERWOOD, C. J.—The second count in the indictment in this cause is as follows: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that Larkin A. Gibson, William Gibson and James Gibson, on the seventh day of April, 1889, at the said county of Harrison, one Ada E. Dyche, a female under the age of eighteen years, to-wit, of the age of fifteen years, unlawfully and feloniously

did take from one William Dyche, her father; he, the said William Dyche, then and there having the legal charge of the person of said Ada E. Dyche, without the consent and against the will of the said William Dyche, for the purpose of concubinage, by having illicit sexual intercourse with him, the said Larkin A. Gibson, and with him, the said William Gibson, and with him, the said James Gibson, and with divers other men whose names are to the grand jurors aforesaid unknown, against the peace and dignity of the state."

This indictment is bottomed on section 3484, Revised Statutes, 1889, which is as follows: "Every person who shall take away any female under the age of eighteen years from her father, mother, guardian or other person having the legal charge of her person, either for the purpose of prostitution or concubinage, and any father, mother, guardian or other person, having the legal charge of her person, who shall consent to the same, shall, upon conviction thereof, be punished by imprisonment in the penitentiary not exceeding five years."

Upon trial had, the defendant was found guilty, and his punishment assessed at imprisonment in the penitentiary for the term of four years.

The second instruction given at the instance of the state was the following: "The jury are instructed that by the word 'concubinage,' as used in the indictment and instructions, is meant the act or practice of a man cohabiting in sexual intercourse with a woman to whom he is not married. If the jury should believe from the evidence that the defendant, either alone or in connection with another, did take the witness, Addie E. Dyche, away from her father without his consent, and that Addie E. Dyche was at the time a female under the age of eighteen years, for the purpose of cohabiting with her as man and woman in sexual

intercourse, either for himself, or for another, for any length of time, even for a single act of sexual intercourse, without the authority of a marriage, it would be sufficient to constitute the offense charged in the second count of the indictment."

I.    This instruction necessitates the determination of the meaning of the word "*concubinage.*"

Under the provisions of our statute "words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." 2 Revised Statutes, 1889, sec. 6570.

If, as we take it, the word employed is to be taken in its ordinary sense, in the popular acceptation of the term, we must turn to the standards of our language in order to ascertain the accepted meaning of the term. When we do this, we find that concubinage is defined by Webster to be "the cohabiting of a man and a woman who are not legally married; the state of being a *concubine.*"  And in turning to the word "cohabit" we find that one of its prominent meanings is "to dwell or live together as husband and wife." And Webster also defines "*concubine*" as "a woman who cohabits with a man without being his wife."

On turning to the law dictionaries, we find concubinage defined, as "a species of loose informal marriage which took place among the ancients, and which is yet in use in some countries." Black's Law Dictionary; Wharton's Law Dictionary; Bouvier's Law Dictionary.

It is well enough, in this connection, to place in juxtaposition and in sharp contrast with the word, concubinage, the other word the section in question employs, "*prostitution,*" which is defined by Webster: "The act or practice of prostituting or offering the body to an indiscriminate intercourse with men;

common lewdness of a female." And in the legal authorities the term is defined as: "The common lewdness of a woman for gain. The act of permitting a common and indiscriminate sexual intercourse for hire." 2 Bouvier's Law Dictionary; *Com. v. Cook*, 12 Met. 97.

Thus contrasted it is easy to see that the two words, concubinage and prostitution, have and were intended to have a widely different meaning. To hold otherwise would be to say that the two words mean the same thing, and that, therefore, the legislature in framing the section under discussion employed a useless and meaningless word, which is a supposition not to be indulged, as abundant authorities show. The section in question levels its denunciations against *two separate and distinct offenses*, offenses which, therefore, cannot be joined in one count, but, if charged, according to a familiar rule, must be charged in separate counts.

This view finds illustration in the state of Kansas, having a section precisely like ours, barring the portion marked with brackets; and there it was held that an indictment which joined the two offenses, a taking for the purpose of prostitution *and* concubinage, was by reason of such joinder fatally defective, HORTON, C. J., remarking: "If the appellant took the female away for the purpose of prostitution, he did so for the purpose of devoting her to infamous purposes; that is, of offering her body to indiscriminate intercourse with men. If he took her away for concubinage only, then his purpose was to cohabit with her in sexual commerce, without the authority of law or a legal marriage." *State v. Goodwin*, 33 Kan. 538. This ruling entirely coincides with definitions already quoted.

The state of Illinois possesses a statute substantially identical with our own, and the practice there is, when

VOL. 111—7

charging the offenses of taking for the purpose of concubinage and of taking for the purpose of prostitution, to charge each of these offenses in a separate count. *Slocum v. People*, 90 Ill. 274; *Henderson v. People*, 124 Ill. 607. In the latter case cited, it is said that the words in question "are in general use, and we have no doubt they were used by the legislature in their general or popular signification."

But every temporary absenting of a girl from the house of her parents, though it be at the instance of the accused, and for the purpose of sexual intercourse with him, does not constitute the act a taking within the purview of the statute. The taking in order to be a taking under the statutory prohibitions must be for one of two purposes, either for the purpose of concubinage, or else for the purpose of prostitution, and not for a mere momentary gratification; or as was interrogatively said by CROMPTON, J., where the offense was based on a similar statute: "If a man make a sign to a girl in her father's cottage, and she comes out and goes away with him for a short time, would that be within the section?" *Reg. v. Timmins*, 8 Cox's Cr. L. Cas. 401. To hold otherwise would be to do violence to the language in question, and create an offense unknown to the law. See *People v. Parshall*, 6 Parker's Crim. Rep. 129, in which case the statute of New York then passed upon is substantially like our own. Seduction or attempted seduction is not within the prohibitions of the section. Indeed, the sexual act is not at all necessary to the commission of the crime under discussion; for the abduction may be done by a *woman* as well as a man. "The *gravamen* of the offense is the purpose or intent with which the enticing and abduction is done" *(Henderson v. People* and *Slocum v. People, supra)*; and the offense is complete whenever the abduction for the prohibited

purpose is complete, no matter whether any sexual intercourse result or not.

The section being discussed does not prohibit mere sexual intercourse; it only prohibits the taking away of a girl where the taking has in contemplation such sexual intercourse as the ultimate result and concomitant of concubinage or of prostitution. Several cases will now be cited which support the view that a mere intent to obtain sexual gratification will not support a charge of a taking away for the purpose of prostitution. *Osborn v. State*, 52 Ind. 526; *Com. v. Cook*, 12 Met. 93; *State v. Ruhl*, 8 Iowa, 447; *State v. Stoyell*, 54 Mo. 24; *Carpenter v. People*, 8 Barb. 603; *State v. Brow*, 64 N. H. 577. These cases though directed against the offense of taking for the purpose of *prostitution* by parity of reasoning support the theory already advanced that a taking for sexual gratification does not fall within the prohibitions of the statute, unless such sexual result be blended with either concubinage or prostitution as its ultimate end and object. And the rule is firmly established, indeed it is elementary, that, where as here the statute makes an offense to consist of an act coupled with a specific intent, the doing of the act raises no presumption that the act was done with the specific intent; but such intent, as well as the act, must be found by the jury as a matter of fact before a conviction can legitimately result. Lawson on Presumptive Evidence, 271; *People v. Plath*, 100 N. Y. 590.

Under the foregoing authorities and all reasonable deductions therefrom, proof of a purpose to have sexual connection, or of the fact accomplished, would not support a charge of a purpose of concubinage or of prostitution, nor would proof of a purpose of prostitution sustain a charge of a purpose of concubinage, nor *vice versa.*

These remarks have been thus extended and authorities cited, not as doubting the correctness of the position they sanction, but because of a ruling made by this court in *State v. Feasel*, 74 Mo. 524, where a similar instruction to the one under discussion was approved. Indeed, the instruction in this instance is even broader in its terms than the one in the case cited; for here if the taking was for the purpose of cohabiting with the girl, "even for a *single act* of sexual intercourse," the jury were told the offense was complete.

After full consideration we are satisfied, for reasons already given, that *Feasel's case* was erroneously decided as to the instruction there commented on, and that case, therefore, should no longer be followed. *State v. Flint*, 62 Mo. 393.

II. Now, as to the sufficiency of the second count of the indictment. If the definition heretofore given as to the meaning, the force and effect of the word *"concubinage"* be correct, then it stands to reason that the indictment charges no offense known to the law, or, in other words, an impossible offense; for it is plainly impossible that three men could each have the same girl for his *"concubine."*

In this case, the charges contained in the count are, therefore, necessarily inconsistent with, contradictory of and repugnant to each other; this repugnancy in the same count makes the whole count bad. 1 Archbold on Criminal Practice & Pleading [8 Ed.] 284; *State v. Mahan*, 2 Ala. 340; *King v. Stevens*, 5 East, 244; *State v. Flint*, 62 Mo. 393; 1 Bishop on Criminal Procedure [3 Ed.] secs. 489–492.

There are cases where the contradictory or repugnant expressions do not enter into the *substance of the offense*, and where the indictment will be good without them they may be rejected as surplusage. *State v. Meyers*, 99 Mo. 107. Or, where the repugnant matter

is inconsistent with any preceding averment, it may be rejected as superfluous. 1 Bishop on Criminal Procedure, sec. 491. Here, the repugnant matters go to the substance of the offense, and are descriptive of it, and, hence, cannot be rejected as merely redundant expressions, since they are essential. 1 Chitty on Criminal Law, 250; 1 Bishop on Criminal Procedure, sec. 491. The indictment must in consequence be held fatally defective.

III. An instruction asked by the defendant in the nature of a demurrer to the evidence was refused, and this requires a review of that ruling. We have been unable to discover any evidence in this record disclosing that the defendant had formed any design or any conspiracy with his father, Larkin A. Gibson, and with his brother, James Gibson, to take away Ada E. Dyche from her father, for the purpose of concubinage, the intent charged in the indictment. Ada E. Dyche does not claim that, prior to the time that she reached Larkin A. Gibson's house, she expected defendant to take her away. She says she went to Larkin A. Gibson's house because *he* had promised to take her away. But this taking away was for the purpose, as she testifies, of *sending her to school.*

When she arrived at Larkin Gibson's, he was not at home; but the defendant and his brother John C. were, and she asked him to take her away, and he told her as she states that he had not agreed to take her away, but his father had, and this is the only evidence that the defendant even knew that she was to be taken away; but she does not pretend that the defendant knew she was to be taken away for any improper purpose. It is true, the defendant, on the night of her arrival, took her away at his father's instance to another relative some seven miles distant, and that they stopped by the wayside and exchanged

sexual favors; but this was the first and only time he ever had to do with her in this sort, and it is true, also, that some days afterwards he called and took her to Des Moines; but she states that it was the original intention that his father was to call for and to take her to Des Moines, but instead of that sent his son, the defendant, who took her there and paid her way, and though he took her to a hotel never had, nor attempted to have, sexual intercourse with her again.    It is true, also, that Larkin A. Gibson, the father, and James Gibson, the son, afterwards went up into Iowa, and had sexual intercourse twice with the girl; but defendant had no connection with these subsequent acts.    And the mere fact that the defendant had sexual intercourse with the girl on the way to his uncle's is no evidence, whatever, that he intended to make her his concubine, or the concubine of another.    This point was so ruled in *State v. Gibson*, decided at the last term, in division number 2 of this court.    108 Mo. 575.

Besides, as before stated, where, as here, a specific intent is required to make an act an offense, to-wit, the taking away of the girl for the purpose of concubinage, the mere doing of the act will not raise a presumption that it was done for such prohibited purpose.    Lawson  on Presumptive  Evidence,  and *People v. Plath, supra.*

But granting for argument's sake that there is evidence in this record making out an apparent case against the defendant of a violation of the statute, still there are other considerations which will infallibly overthrow such *prima facie* case.

The defendant, at the time of the offense charged, was some twenty-three years of age.  His younger brother "Jim" was only fifteen years of age, and had become strangely infatuated with the girl, and she with him,  and they became criminally intimate and had

tasted of the forbidden fruit on many and divers occasions. There is much testimony in this record to show that the object of spiriting the girl away was to break up the intimacy which had sprung up between the younger brother and the prosecutrix; and there was much evidence to show,—indeed, the great preponderance of the testimony tends to show, that neither Ada Dyche nor her sister were chaste, either in reputation or in character. In proof of this, the prosecutrix testified, when on the stand that Henry Gilbert, a school teacher, came upon "Jim" Gibson and herself at night, when he was trying to have sexual intercourse with her, when at that time her sister and her escort, Sego, were only a few feet away "*talking.*" And her sister also testifies that both Jim Gibson and the prosecutrix told her they were "trying," *i. e.*, making efforts, to have sexual intercourse. Statutes of other states, which punish abduction of females, require that such females should be of "previous chaste character."

Our statute does not in terms require a previous chaste character; but it seems that such a requirement is necessarily included in a definition of the offense. This view becomes very obvious when you consider the evident purpose and central idea of the statute. That purpose is evidently *a prophylactic* purpose. The intention of the statute was to prevent virtuous girls under a certain age from being taken away from under parental or other legitimate control, and converted into concubines or prostitutes. If, however, before being thus taken away a girl has already lost her virtue, she is not within the protection of the statute; it came to save the virtuous, not the unchaste and the harlot. Of this opinion is Judge KELLEY, as to the force and effect of our statute. Criminal Law, sec. 519. See also *Reg. v. Primelt*, 1 F. & F. 50.

As to the analogies of the law in cases of seduction, see *State v. Patterson*, 88 Mo. 88; *State v. Primm*, 98 Mo. 368.

Five weeks and two days after the prosecutrix had left home and gone to Iowa, she returned and sought and found refuge at Larkin A. Gibson's house.

If the defendant at that time did anything to conceal the girl from her father, this could have no effect towards showing his guilt in the original taking; for that was complete before the occurrence of the alleged subsequent act. *State v. Melrose*, 98 Mo. 594.

There are a number of other errors assigned, but it is unnecessary to notice them, in consequence of remarks already made. The judgment should be reversed, and the defendant discharged.

BRACE and GANTT, JJ., concur in all that has been said, except in paragraph 4; BLACK and MACFARLANE, JJ., concur in nothing that has been said except in paragraph 3; THOMAS, J., files a separate and dissenting opinion, and BARCLAY, J., is absent.

THOMAS, J. *(dissenting)*.—I am unable to agree to the conclusion reached in the foregoing opinion or the reasoning on which it is based. I think the indictment sufficient.

The first objection to the indictment is that it charges three men with taking away a female for the purpose of concubinage by having illicit intercourse with them and divers other men to the jurors unknown. The argument is that three men designing to have sexual intercourse with a female might take her away for the purpose of prostitution, but not for concubinage. This proposition involves the discussion of the distinction between concubinage and prostitution. In ancient times concubinage was a semi-legal relation between the sexes, and this is the case among many eastern

people to-day   But at common law there are no grada-tions in sexual relations.    Men and women live together in the relation of a legal marriage, or their sexual inter-course is meretricious and illegal.   Concubinage is defined to be the act or practice of cohabiting in sexual intercourse without the authority of a legal marriage. Bouvier's Law Dictionary; Webster.   This, says Judge NORTON in *State v. Feasel*, 74 Mo. 524, "is the accepted meaning of the word at common law, and was, we think, used by the legislature in that sense."

The statute under which defendant was prosecuted was, beyond doubt, intended to cover every case where a female under eighteen years of age is taken away from her parent for illicit intercourse, and to accomplish this purpose the words, "prostitution" and "concubin-age," are used.    Here as elsewhere it is difficult to say definitely where one ends and the other begins.    Pros-titution, says Webster, is "the act of prostituting or offering the body to an *indiscriminate* intercourse with men;   common   lewdness   of   a   woman," and   this definition  is  adopted  by  defendant's  counsel  in  this case.   Now   if   defendant   had   been   indicted   for taking the girl away for the purpose of prostitution, we would be met by the argument that sexual inter-course with *three* men was not *indiscriminate* intercourse with men, and, therefore, that the taking away was not for the purpose of prostitution, and in my opinion this argument would be sound.   A prostitute offers her body to all comers, and usually for gain.   Now, if the defend-ant's contention that concubinage consists in the illicit intercourse of one man and one woman be correct, the words, "prostitution and concubinage," would not cover cases where females are taken for intercourse with more than one man, and yet not for intercourse indiscrimi-nately with the other sex.   I can scarcely think that the legislature intended so absurd a result.   The indict-

ment, therefore, is not defective because it avers that the purpose of defendant was that the female should have intercourse with three parties named.   The averment that the defendant took the female away for the purpose of concubinage controls the subsequent words. The word "prostitution" is not used, nor is it accurately defined in the indictment.   The words, "and divers other men to the grand jurors unknown," may be rejected as surplusage.   "As surplusage does not injure an indictment if it charges two offenses in a single count, but one of them insufficiently, it is not, therefore, double; to be so, it must set out each in adequate terms."   1 Bishop on Criminal Procedure [3 Ed.] sec. 440.

This indictment follows the form given by Judge KELLEY.   Kelley on Criminal Law [1 Ed.] sec. 515.

The second objection is that the indictment fails to allege that the purpose of defendant in taking away the female was felonious.   This objection is not well taken. The word "feloniously" as used in the indictment qualifies the purpose as well as the act of taking, and the crime is, therefore, charged to have been done feloniously.

The third objection is that the indictment does not allege that the purpose of defendant was to cohabit with the female without the authority of law or a legal marriage.   This allegation is not necessary.   The words, "for the purpose of concubinage, by having illicit sexual intercourse," imply *ex vi termini* that such intercourse was to be without authority of law or a legal marriage.

II.   The state proved: *First.*   The contents of a letter written by Larkin A. Gibson to the girl asking her to come to his house, and he would have her taken away. *Second.*   Sexual intercourse of Larkin A. Gibson and James Gibson and the girl after she was taken away.

*Third.* A conversation between the father of the girl and Larkin A. Gibson, after she had returned to Gibson's house. The defendant contends that the trial court erred in admitting such evidence over his objections, because the conversations and acts of these parties did not occur in his presence, and there was no evidence of a conspiracy between him and them.

To dispose of these objections, it becomes necessary to give a synopsis of the evidence: Ada E. Dyche, the girl charged to have been taken away by defendant, was fifteen and a half years old and lived with her father in Harrison county on a farm adjoining the farm owned by Larkin A. Gibson, who is the father of this defendant and James Gibson, between a quarter and half a mile away. Her mother was dead, and her father had married again. The girl went to defendant's house on Sunday afternoon, April 7, 1889, taking her clothes tied up in a bundle with her. She found defendant and his brother, John C. Gibson, there, Larkin A. Gibson, his wife, and James Gibson being away from home. She told defendant she had come to go away, and she wanted them to take her away, as they had agreed. Defendant told her that he had not agreed to take her away, but his father had, and she would have to wait till the latter came home. She left her clothes some distance from the house, and, upon her informing defendant where they were, he directed his brother to get them, which he did.

The girl testified on her cross-examination by defendant that she went to Gibson's in pursuance of a letter Larkin A. Gibson had written her, which she had torn up, telling her to come to his house, and he would have her taken away. She also testified that up to that time she had had no arrangement with this defendant to take her away, and that she wanted to leave home. Larkin A. Gibson and his wife returned home late the

same afternoon. The defendant, at the request of his father, took the girl in a buggy and left his home with her about seven or eight o'clock P. M. that night, and started to Walker Gibson's, an uncle of his, about seven miles distant. On the way there he had sexual intercourse with her. He and she reached the uncle's between nine and eleven o'clock. Defendant called his uncle, who had gone to bed, and requested him to take the girl to Joe Gibson's, another uncle of defendant living at Ridgeway, which he did that night, reaching the latter's home before day next morning, defendant telling the girl he would meet her there again. Defendant returned home that night, and on Tuesday he went to Ridgeway, and took the girl to Des Moines, taking passage on a railway, he paying the fare of both. They went to a hotel and put up for the night, defendant paying for the night's lodging. Next day he went home, and she staid at this hotel two weeks, when Larkin A. Gibson and James Gibson went and took her to Eldora, where they both had intercourse with her the same night at a hotel. She staid at this place two nights. Larkin A. Gibson then took her to Leon, and then sent her to Ridgeway, and then to St. Joseph, Missouri. She went to the home of the friendless at the latter place, where she met a sister of hers. The sister loaned her some money and she went back towards defendant's home till she reached Siloam, a few miles away, whence she was taken in Frank Gibson's wagon to defendant's home, reaching there about May 7. She staid upstairs while there.

On May 10, her father heard she was at Gibson's, and next morning, May 11, he took two of his neighbors and went over there. The girl, from an upper window, seeing them coming, ran down, and the defendant told her to go to a sheep shed some distance from the house, and stay in it. The defendant got behind an apple tree in the orchard about twenty-five

yards from this shed. The father of the girl and his two attendants went into the yard, and Larkin A. Gibson met them there. On inquiry being made for the girl, Larkin A. Gibson said 'she was not there, and he did not know where she was. Her father was permitted to search the house, and not finding her there he went to the barn, and finally to the sheep shed where he found her and took her home.

She was gone from April 7 to May 11, and her father could learn nothing of her whereabouts till May 10. Defendant denied all knowledge of the girl's intentions, until she came to his father's, April 7.

The evidence shows that defendant told the girl that he would take her away again that day (May 11), and when her father found her she had her clothes tied up in a bundle ready to go. Defendant claimed he took the girl away in the first instance at her request to get her a place to stay, because she did not want to remain at home.

A careful perusal of the evidence in this record, of which the foregoing is a fair summary, convinces me that there was a common design, a conspiracy, between the father and James Gibson and this defendant, to take the girl from her father, and from under his control, care and protection, for the purpose of concubinage, and what each said and did in regard to her, during the period she was under their control, is evidence against all. The *res gestæ* embrace this whole period. Defendant cannot complain, however, of the admission of evidence of the contents of the letter the old man wrote to the girl, even if no conspiracy was proven, for he brought it out himself on cross-examination.

Evidence of the sexual intercourse of the father and brother with the girl was admissible to show the purpose for which she was taken away. And it seems

very clear that what the defendant's father said to the girl's father on May 11 was admissible against defendant; for he had hid the girl, and was watching from behind an apple tree in the orchard at the time. He was to take the girl away again that day, and what occurred there tended to prove that defendant's object was to remove and keep her from her father's control.

III. The defendant assigns for error the refusal of the court to permit him to read in evidence a letter written by the girl to James Gibson dated May 12, 1888, and one to Larkin A. Gibson dated February 19, 1889. The contents of these letters would have tended to prove two facts: *First.* That the girl wanted to leave home, and, *second*, that this desire was known to at least two of the conspirators for months before she was taken away. We do not think this latter fact would have aided the defense, but on the contrary it would have strengthened the theory of the prosecution that there was a conspiracy, and as to the first we have to say that her desire to leave home is immaterial. That is no defense under the statute. She was under the age of consent. *Tucker v. State*, 8 Lea (Tenn.) 633; *People v. Cook*, 61 Cal. 478; *Reg. v. Biswel*, 2 Cox, C. C. 279; *Reg. v. Robins*, 47 Eng. C. L. R. 456; Bishop on Statutory Crimes [2 Ed.] sec. 634; Kelley on Criminal Law [1 Ed.] sec. 517.

A girl under eighteen years of age cannot make a valid contract for the disposition of her property, and much less can she give consent to part with that which makes her poor indeed, and which no earthly tribunal can restore to her. The statute was intended to throw around females under that age and around their homes its protecting care and to shield them from debauchers and seducers.

IV. The court did not err in refusing to permit defendant to show previous acts of unchastity on the

part of the girl. The statutes of some of the states require the female to be of previous chaste character, but ours contains no such provision. Our statute recognizes the parent's right to the custody of an erring daughter, and to save her from a continued life of shame, if it be possible, by his care, advice and oversight.

To hold otherwise would outlaw girls who had fallen, and would deprive them of parental protection. Is there no place in our system of laws for reformation? If not, what becomes of the reformatory institutions of this and other lands? Shall we say to men and women, too,—for women can be guilty of the crime under discussion,—that they can invade homes and take girls from their parents for the purpose of concubinage or prostitution, and be guilty of no crime, if it can be shown they are unchaste at the time of the taking? If ever a girl needs the care of a father or mother as guardian, it is after she has stepped aside. Though society may ostracize her, a parent does not always desert his child to her fate, and often is willing to retain her in his home, saying to her gently and kindly, "Sin no more." He may not succeed in her reformation, yet he has a right, a legal right, to try. Ada Dyche, though unchaste in a legal sense, was not steeped in sin to the extent of the common prostitute. The removal of her from her home and from the control of her father was a crime against the father and that home. It was a crime also against the girl, because she was under the age of consent.

Nor is the position assumed in the foregoing opinion that an unchaste female is not within the protection of this statute supported by authority. Judge KELLEY, who is cited, does not assert the proposition in direct terms; his language being in the suggestive form. He says: "As the object of the law is to

prevent turning girls into prostitutes, it is quite prob-
able that if the girl was of lewd character, or if her
parents encouraged her in a lax course of life, the
defendant should be acquitted, unless she had reformed,
although the statute of Missouri says nothing about
previous chastity." Sec. 519. And he cites *Reg. v.
Primelt*, 1 F. & F. 50; *Carpenter v. People*, 8 Barb.
603; *Kenyon v. People*, 26 N. Y. 203; *Andre v. State*, 5
Iowa, 389, and *State v. Carron*, 18 Iowa, 372, in support
of his suggestion; but with all due deference to the
learned author I do not think these cases justified him
in throwing doubt on the question.

*Primelt's case* arose under the English statute of 9
George IV., chapter 31, which made it an offense to
take a female under sixteen years of age out of the
possession and against the will of the parent, without
regard to the purpose of the taking. The issue in the
case was whether defendant had taken the girl out of
the possession and against the will of the mother, and
"the chief justice directed the jury that  *  *  *  if
they thought that the mother had by her conduct
countenanced the daughter in a lax course of life, by
permitting her to go out alone at night, and to dance at
public houses, this was not a case that came within the
intent of the statute, but was one where what had
occurred, though unknown to her, *could not be said to
have happened against her will.*" Here not a word was
said about chastity, nor did the chief justice authorize
an acquittal on the ground that the female was
unchaste, but on the ground alone that defendant had
not taken her out of the possession and against the will
of the mother." ·

As to the cases cited from New York and Iowa, I
will simply remark that the statutes in those states,
defining the crime of abduction, require the female to
be of a previous chaste character, and, of course, those

cases are not authority for the construction of our statute, which wholly omits the element of chastity.

On the other hand California has a statute similar to ours, and the supreme court of that state in discussing this question, in *People v. DeMousset* (1887), 71 Cal. 611, said: "It will be observed that the section says nothing about the chastity of the female. The law is intended to protect the chaste and reclaim the erring; to protect parents and guardians in their custody and care of minor females, without regard to the character of such female for chastity, and the family from sorrow and disgrace. We are not disposed, in the construction of this section, to interpolate any phrase that will detract from its effectiveness in this regard." I heartily indorse this language as expressive of the true meaning of our statute.

That Judge KELLEY's statement that the object of the statute was to prevent "turning girls into prostitutes" is too narrow, I repeat what Judge NORTON said in the *Feasel case* that "it was evidently the design of the legislature in the enactment of said statute to protect females under eighteen years of age from debauchery and the seductive arts of vicious, lewd and lascivious persons, and *also to protect the domestic circle* from invasion by such characters, having in their hearts such a purpose."

The position I have assumed is sustained also by the case of *State v. Strattman*, 100 Mo. 548. That was a prosecution for defiling a female standing in a confidential relation to the accused. The statute defining the offense, like the one in question, wholly omits the element of chastity. Judge SHERWOOD, speaking for the court in that case, said: "The section upon which the present indictment is grounded levels its denunciations and penalties against every one to whose care and

protection any female under the age of eighteen years is confided, who violates the trust reposed in him in the manner that section condemns. Unchaste to all the world beside, *she must be pure to him*. This is the evident policy and central idea of the statute."

V.    As an original proposition I would not have concurred in the doctrine of the *Feasel case*, but it was announced eleven years ago, and since then we have had five biennial sessions and one revising session of the general assembly, and no suggestion of error in the definition of concubinage has been made, and there has been no attempt to change or modify it. The doctrine of the *Feasel case* was approved by division number 2 in *State v. Stone*, 106 Mo. 1.

Words acquire their meaning by usage. This court in 1881 defined concubinage to be the cohabitation of a male and female in sexual intercourse for any length of time, even for a single night, and this definition has been acquiesced in ever since by the people and the legislative and judicial departments of the state government. The legislature has the power to make it crime to take minor females from their homes for the purpose of illicit intercourse, as is done in many states. This court said eleven years ago that is what the legislature did do in the enactment of the section of the statute under discussion. The *nisi prius* courts adopted the definition and acted on it. The general assembly has failed to declare that that was not its meaning, and shall we now reverse that ruling and undertake to define concubinage? The former definition is in line with good morals, and my judgment is now that we should stand by and reaffirm it.

But conceding that the instruction defining concubinage is subject to criticism, yet I think the instructions taken as a whole were very fair to defendant under the evidence in the case. The court was very explicit

The State v. Gibson.

in telling the jury what elements entered into the crime with which defendant was charged. Here are the other instructions, not quoted in the foregoing opinion, in regard to what it takes to constitute abduction under our statute.

"In order to find defendant guilty under this indictment it is not necessary that the jury should believe from the evidence that the defendant took Ada E. Dyche away from the immediate possession, house or premises of her father, William Dyche, but it is a sufficient taking away if the defendant alone, or acting in connection with another, took her away from the control and possession of the said William Dyche, and took her out of the neighborhood, so that her whereabouts were unknown to said William Dyche, without his consent."

"The court further instructs the jury that the term or phrase, 'take away for the purpose of concubinage,' as used in the instructions, means that the defendant himself, or others acting in conjunction with him, must have induced, persuaded or decoyed the witness, Ada E. Dyche, away from her father, for the purpose of having illicit sexual intercourse with her. Therefore, unless you believe from the evidence, beyond a reasonable doubt, that the defendant, on the seventh day of April, 1889, persuaded said Ada E. Dyche to go away from her father, and that such persuasion was for the purpose and with the intention of having sexual intercourse with her, or with others, then you must acquit the defendant."

"The court instructs the jury that, unless they believe from the evidence that defendant started from the house of L. A. Gibson with Ada E. Dyche, with the intent or for the purpose of having sexual intercourse with her, or for the purpose of others having

sexual intercourse with her, then he is not guilty of a taking away under the law, and you should acquit him."

"The court further instructs the jury that if they believe that the said Ada E. Dyche left her father's house, and went to the house of L. A. Gibson, without any inducement of the defendant, and requested defendant to take her away from home, then defendant was not bound to turn her out or take her home, and that unless the defendant himself, or in conjunction with another, or others, had some prior arrangement with her, that he or they, so acting in conjunction, would take her away, then he is not guilty, and you will acquit the defendant."

"The court instructs the jury that the law presumes the defendant to be innocent of the crime charged, and this presumption maintains throughout the entire trial, until it is overcome by evidence that establishes his guilt to your satisfaction and beyond a reasonable doubt. By the word or terms, 'a reasonable doubt,' is meant, convinced to a moral certainty. A juror is understood to entertain a reasonable doubt when he does not feel an abiding conviction of the truth of the charge to a moral certainty, and, unless you are thus convinced, you must find the defendant not guilty."

Under these instructions the jury must have found. notwithstanding defendant's protestations to the contrary, that he took the girl away for the purpose of having sexual intercourse with her, and took her away from the neighborhood, "so that her whereabouts were unknown" to her father. Indeed, what other purpose could he have had? There is nothing whatever in the pretense that she was taken to Iowa to be put to school. The jury negatived such a purpose in finding that she was taken away for the purpose of sexual intercourse. And she was taken to be kept away for an indefinite time, and having been taken for the purpose of sexual

intercourse the offense was committed. *Henderson v. People* (1888), 17 N. E. Rep. (Ill.) 68.

The instruction, that in order to convict defendant it was not necessary that he took the girl from the immediate possession, house or premises of her father, but that it was sufficient that if he alone, or acting in connection with another, took her away from the control and possession of the father, was correct. It cannot be expected that a parent can have immediate and actual possession of his children all the time. The taking away contemplated by the statute is that taking which removes the female from the care, custody and control of the parent, and places her under the control of another. *People v. Cook, supra; State v. Gordon*, 46 N. J. Law, 432; *Reg. v. Mycock*, 12 Cox, C. C. 28; Kelley on Criminal Law, sec. 517; *State v. Round*, 82 Mo. 679.

Nor was it necessary to prove that defendant enticed the girl to go off with him. Our statute uses the words "take away" only, and the girl's willingness, and even offer to go away, will not excuse the party who takes her away. The authorities cited above show this conclusively.

The court instructed the jury that if they should "believe from the evidence that the witness, Ada E. Dyche, had sexual intercourse with others than the defendant before the seventh of April, 1889, that would not justify or excuse the defendant if he was guilty of misconduct; but evidence in reference to such conduct on her part was admissible only for the purpose of showing her moral character, and thereby affecting her credibility as a witness." The defendant complains of the use of the word "misconduct" here. This was an unfortunate expression, but taken in connection with all the instructions it could not have misled the jury. In five instructions the court told the jury specifically and correctly what constituted the crime with which

the defendant was charged, and what essential facts they had to find in order to convict him, and then instructed the jury that the law presumed defendant innocent, which presumption continued with him throughout the entire trial, until it was overcome by evidence that established his guilt beyond a reasonable doubt, and that "a juror is understood to entertain a reasonable doubt when he does feel an abiding conviction of the truth of the charge to a moral certainty."

I think the evidence warranted the verdict. This record discloses a most remarkable state of affairs. The Gibsons and Dyches lived in less than a half a mile of each other. This girl was taken by defendant from his father's home after night. She and he had sexual intercourse on the road. He took her to an uncle's, reaching there before morning. The uncle continued the journey with her the same night to another uncle's, where she staid for a day, when defendant took her to Iowa. The father of defendant, who had a son married, taking his son James, a mere lad, with him, went to where the girl was in Iowa, and the father and the son had sexual intercourse with her the same night. She was gone over five weeks, her father inquiring for her and looking for her, and when she returned to Gibson's she was kept hid, and arrangements were made for defendant to take her away again. The father with his neighbors went for the girl, whom defendant hid in a shed and watched, while his father denied to the father of the girl that she was there. The father persisted in his search however, and found her and took her home. She was a mere child, and the conduct of her father was commendable in not leaving her to her fate.

It seems to me there was a preconcerted scheme to take this child from home and home influences and from parental care and protection for vile purposes.

She was treated like a brute. Think of it! The defendant taking her away at night and having intercourse with her, and then the father and a sixteen-year-old son having connection with her the same night. Can depravity go much farther? Shall we say that the intention of these parties was to educate the child? Why go away at night, without the knowledge or consent of the father, who was a neighbor? That will not do. Shall we say that the object of the abduction was to wean her from James Gibson who was infatuated with her and she with him? Then, why did the father take his son to the girl to enable him to have intercourse with her? This theory will not do. The jury reached the only conclusion that the testimony justifies, and that is that she was abducted for the purpose of illicit commerce. The judgment in my opinion ought to be affirmed.