STATE, Respondent, v. DUFFY et al, Appellants.

(225 N. W. 61.)

(File No. 6409. Opinion filed April 13, 1929.)

112

See State v. Maurer et al, 50 S. D. 644, 211 N. W. 457.

*Harry P. Atwater,* of Sturgis, for Appellant Duffy.

*Thomas G. Wall,* of Sturgis, for Appellant Maurer.

*Buell F. Jones,* Attorney General, and *Bernard A. Brown,* Assistant Attorney General, for the State.

CAMPBELL, J.   The defendants were informed against for abduction, the information charging that said defendants did commit the crime of abduction, in that on or about the 19th day of July, 1926, in Meade county, S. D., they "did wilfully, unlawfully, and feloniously persuade, induce, entice and take away one R. and one C., they being at the time females under the age of 18 years, from their parents, without the consent of the parents of the said R. and C., for immoral purposes, debauchery, and illicit relationship, contrary to the form of the statutes," etc.   No severance was demanded, nor was any objection made to the plain duplicity of the information, and upon their pleas of not guilty defendants were

tried to a jury. A verdict of "guilty as charged in the information" was returned against each of the defendants, pursuant to which the court pronounced judgment, and sentenced each of said defendants to the penitentiary for a term of six years, refused them bail pending appeal, which was granted by this court (see State v. Maurer et al, 50 S. D. 644, 211 N. W. 457), and from such judgment and from the order denying their respective motions for new trial the defendants and each of them have now appealed.

Appellants, by proper record and apt assignments of error, present for our consideration the question of the suffciency of the evidence to sustain the verdict.

■ The offense is charged under chapter 1, Session Laws 1921, which reads as follows:

Section 1. That Section 4102 of the South Dakota Revised Code of 1919 be and the same is hereby amended to read as follows:

"Section 4102. Every person who takes away any female under the age of fifteen years from her father, mother, guardian or other person having the legal charge of her person, without his or her consent, for the purpose of marriage; and every person who shall persuade, induce, entice, coerce, or take away any female under the age of eighteen years from her father, mother, guardian, or other person having the legal charge of her person for the purpose of debauchery, illicit relationship, concubinage, prostitution, or other immoral purpose is punishable by imprisonment in the state penitentiary not to exceed twenty years."

Under that portion of our statute here involved (which is similar to the statutes of many other state relating to the same crime) there are three essential elements of the offense: First, there must be a persuading, inducing, enticing, coercing, or taking away of a female under the age of 18 years; second, the taking away, enticing, coercing, etc., of such female must be from her father, mother, guardian, or other person having legal charge of her person; third, such taking, enticing, etc., must be for the purpose of debauchery, illicit relationship, concubinage, prostitution, or other immoral purpose. To establish the offense charged in the information in this case it was necessary for the state to prove beyond a reasonable doubt that the females in question were under the age of 18 years; that the appellants persuaded, induced, enticed,

or took said females from their parents without the consent of the parents; and that such taking was for debauchery, illicit relationship, or immoral purposes. The gist of the offense in abduction, under statutes such as ours, is the taking of the female, under the statutory age and without the consent of her parents or guardian, for the purpose and with the intent of subjecting the female to sexual relations within the prohibition of the statute. The phrase "illicit relationship" used in the statute and in the information in this case very clearly means illicit and unlawful sexual intercourse. The word "debauchery" as used in our statute and similar statutes and in this information has a quasi technical meaning and is practically synonymous with the phrase "carnal knowledge." See State v. Curran, 51 Iowa, 112, 49 N. W. 1006; State v. Wheeler, 108 Mo. 558, 18 S. W. 924; Putman v. State 29 Tex. App. 454, 16 S. W. 97, 25 Am. St. Rep. 738; State v. Whalen, 98 Iowa, 662, 68 N. W. 554; State v. Long, 238 Mo. 383, 141 S. W. 1099.

The words "other immoral purpose" in the statute and the information were correctly defined by the learned trial judge in his instructions to the jury in the following language:

"The taking of the girls by the defendants must have been for the purpose of debauchery, illicit relationship, concubinage, prostitution or other immoral purpose. The words, 'other immoral purpose,' as used in this statute do not mean any other improper or illegal purpose, but mean that the 'other immoral purpose' must have been a purpose of like kind or similar to the purpose of illicit relationship, concubinage or prostitution. In other words, such other immoral purpose must have been a purpose to commit some sexual crime with these girls similar in character to those listed and described in the statute as concubinage, prostitution, debauchery or illicit relationship"—which instruction was not excepted to and became the law of the case; and the learned trial judge further and correctly instructed the jury (there being no claim by the state in this case of any taking for the purpose of prostitution) that it was necessary in this case for the state to prove that the appellants "enticed these two girls from their parents, with the specific intention of having illicit sexual relations with them."

As we understand the situation, appellants in this case concede in substance that the females in question were under the age of 18 years; that they were taken away from the custody of their parents

by the appellants without the consent of such parents; but appellants most vigorously contend that the state entirely failed to prove, beyond a reasonable doubt or at all, that such taking was for any of the purposes prohibited by the statute as defined by the instructions of the court.

■ That, under such a statute as this, the state must prove beyond a reasonable doubt, not only a taking within the meaning of the statute, but a taking for a prohibited purpose, and that mere proof of the taking does not raise a presumption that the taking was done with the specific intent necessary to constitute the offense under the statute, is too plain for argument.

"To abduct a female is no crime under the laws of this state, unless, among other prescribed conditions, the abduction is for some one or more of several purposes mentioned in sections 333, 334, and 335. Penal Code 1903." Linden v. Oster, 37 S. D. 113, 156 N. W. 911.

"And the rule is firmly established, indeed it is elementary, that, where as here the statute makes an offense to consist of an act coupled with a specific intent, the doing of the act raises no presumption that the act was done with the specific intent; but such intent, as well as the act, must be found by the jury as a matter of fact before a conviction can legitimately result." State v. Gibson, 111 Mo. 92, 19 S. W. 980.

"If the evidence establishes only a taking and fails to show that it was for the prohibited purpose it is insufficient to sustain the conviction. * * * It is elementary when a specific intent is required to make an act an offense, that the doing of the act does not raise a presumption that it was done with the specific intent." People v. Plath, 100 N. Y. 590, 3 N. E. 790, 53 Am. Rep. 236.

■ The material facts developed by the evidence in this case are substantially as follows; Appellants are young men residing in Harding county, little known in Sturgis, and there was no previous acquaintance between appellants, or either of them, and the females in question. R. resided with her parents in Sturgis and was just past 15 years of age. C. was also a little more than 15 years of age. Her parents resided on a farm some ten miles from Sturgis; but at the time in question C. was working as a domestic for a family in Sturgis and had been so employed for about two weeks. On the 19th day of July, 1926, as the appellant Duffy was walking

down the street in Sturgis with some other young men, he met the two girls and made a remark to the young man with whom he was walking something to this effect: "That's a cute girl," or "Cute girls." The girl R. made some comment back, such as, "Yes, we are cute," or some similar remark. A little later in the afternoon Duffy again met the R. girl on the street and stopped and asked her if she did not want to go for an automobile ride with him and his friend. She said that she would get her girl friend. Shortly afterwards the appellants, driving a Jewett coach belonging to appellant Maurer, drove around the corner at the Majestic Theater and the girls, who had reached there at the same time, got into the car, the C. girl getting in the front seat with Maurer and the R. girl in the back seat with Duffy.

The mother of the R. girl came up the street just in time to see the girls get in the car and drive off, but was not within speaking distance. This was about 4 o'clock in the afternoon. The car was driven from the point where the girls got in down Junction avenue, toward Rapid City, then turned east one block, then north to the road leading toward Fort Meade; they drove to the sawmill at Fort Meade and turned and came back toward Sturgis, stopping at a point on the military reservation, where one of the appellants got out and secured a bottle of intoxicating liquor apparently hidden along near the road and all took a drink, or at least pretended to take a drink. They then drove to the point on Lazelle street where the road turns toward Newell and drove up what is known as the "Sly Hill." At the top of Sly Hill they had a puncture, which was repaired, and they then drove north, getting off of the regular road and driving up near Bear Butte, which required them to drive through some fields to get back onto the Newell road, the C. girl directing them, as she was acquainted with the country, it being not far from her home.

Then they drove on through Newell and from there to the experiment farm, where one or both of the appellants talked to some person they knew, and then on the way out picked up a bottle of moonshine from out of the alfalfa. They drove to Nisland, the bottle being cached in a field. They all had supper at Nisland, and the appellants left the girls at the restaurant while they went out to cash a check.

The girls, after waiting a while for the appellants, went on

out and got into the car, where they remained until appellants returned. They then drove through Belle Fourche and Spearfish to Deadwood, where they went to a dance in the amusement park. This was a public dance and very largely attended. At this dance the brother of the R. girl talked to both the girls and the appellants and advised them that they should return home, and he testified that the appellants said they would take the girls home. This was about 10 or 11 o'clock in the evening.

It may here be noted that the mother of the R. girl, who had seen the two girls get into the car on the street in Sturgis about 4 o'clock in the afternoon, had testified that about 7 o'clock that evening, her daughter not having returned, she requested the officers to make a search for the girl and also told her husband and her son about the situation before advising the officers. The brother of the girl R. had received this information from his mother before he went to the dance at Deadwood, where the girls presently came in the company of appellants and where the girl R. danced with both appellants and with her brother; but he made no effort to take the girls, or even his sister, into his custody or to take them home, but as he says: "I told my sister that the folks were looking for her and wanted her to go home." He said that the girls and the appellants wanted to dance a little more, but that he told them that they should go home and they could dance some other time, and they left. The brother paid no further attention to the matter, but stayed there at the dance until it broke up.

After leaving the dance at Deadwood the appellants and the two girls went to Lead. All four of the party were of the opinion when they started for Lead that another public dance was in progress there, but on arriving found they were mistaken in that regard. On the way to Lead they had another puncture, and at Lead considerable time was taken up in getting some tires repaired at a tire shop. The appellants left the girls at either the tire shop or the car and went up town. The girls walked around Lead for some time and met the appellants and returned to the car with them. Appellants had obtained some cider at Lead. They then went back to Deadwood and picked up the bottle containing what was left of the moonshine, which had been cached when they went to Deadwood to the dance. The girls testified that appellants mixed the cider with what was left of the moonshine and they

then drove out of Deadwood and to Spearfish. At both Spearfish and Belle Fourche they stopped and tried to get something to eat, but all of the eating houses were closed; it being then 2 or 3 o'clock in the morning. They then drove toward Newell. About 5 o'clock a stop was made at a road camp before they reached Newell, where a young man testified he talked to the party and asked the girls where they were going, and one of the girls said they were going to Buffalo. The girls testified that they stopped at another road camp, where a jug containing more moonshine was purchased and taken in the car, some of which was drunk. At some store they stopped and got something to eat.

The evidence shows that the appellant Maurer had been subpœnaed as a witness in a trial or hearing that was to be held on that afternoon of the 20th at Buffalo, and that this matter had been discussed and the party had agreed to go to Buffalo for that purpose. They reached Buffalo some time about 1 o'clock in the afternoon. They drove on through the town, and deposited the jug containing what was left of the moonshine under a culvert about a half mile out of town.

Thereupon they returned to Buffalo and drove up to the courthouse. The girls stated that they wished to go down to the hotel, whereupon appellants drove down to the hotel and let the girls out of the car and both appellants drove back up to the courthouse. The girl R. testified: "We were expecting to start back as soon as the hearing was over. That was the arrangement that had been made as soon as Art was released from the trial we would all start back. We went to Delinger's hotel and the boys went up to the courthouse to attend the trial. I was in the basement of the hotel and there was some little girls there at that time, Delinger's daughters. While we were there waiting for the boys to come down we were dancing and playing the piano and singing."

The proprietor of the hotel became suspicious that the two girls were running away from home, and he had his little daughter go and ask them why they came to Buffalo and why they wanted to go back and then went and informed the sheriff, who, after making some investigation of the matter, arrested appellants. Meantime the parents of the girl R. had found out that the party had gone to Buffalo, and they came to Buffalo, reaching there about 5 o'clock in the afternoon and finding the girls at the home of the

sheriff.   They  thereupon  took  charge  of  both  girls,  remained  in
Buffalo  that  night,  and  took  them  home  the  next  day.

█  Consent  of  the  abducted  female  is,  of  course,  no  defense
in  a  prosecution  for  abduction,  but  it  should  be  noted  in  this  case
that  nothing  was  done  at  any  time  that  was  really  objected  to  in
any  serious  manner  by  either  of  the  girls.   R.  testified:  "I  think
the  dance  was  mentioned  on  the  road  from  Nisland  to  Belle
Fourche  but  I  am  not  sure.   It  was  then  first  suggested  that  the
crowd  should  attend  the  dance  in  Deadwood;  that  was  some  time
between  six  and  seven  in  the  evening.   We  all  agreed  to  attend  that
dance  and  make  that  trip.   It  was  agreeable  to  all,  both  the  boys
and  girls,  to  go  to  the  dance."

There  is  no  syllable  of  evidence  in  the  record  that  either  of  the
appellants  attempted  in  any  way  or  manner  to  have  any  sexual  re-
lations  with  either  of  the  girls  at  any  time  or  proposed  any  such
relations.   R.  testified  that  appellants  had  their  arms  around  the
girls  and  kissed  them,  but  did  nothing  else,  and  said:  "Well,  I
guess  we  girls  were  quite  willing  to  take  the  ride  up  to  Buffalo.
We  were  willing  to  take  the  ride  up  to  Buffalo,  before  any  one
said  anything  about  it  or  before  our  parents  came  up  there,  the
trip  just  suited  we  girls  and  we  were  having  a  good  time.   There
was  nothing  wrong  about  it  so  far  as  I  know  and  the  boys  had
not  done  anything  wrong  to  either  of  we  girls."

It  does  appear  that  on  several  occasions  on  the  trip  appellants
made  use  of  profane  and  obscene  language;  as  the  girl  C.  said,
"They  swore  some."   But  it  does  not  appear  that  the  sensibilities
of  the  females  in  question  were  in  anywise  offended  by  the  lan-
guage  used.   The  girl  C.  said  that  when  she  was  riding  with  the
appellant  Maurer  in  the  front  seat,  Duffy,  riding  in  the  back  seat
with  the  girl  R.,  annoyed  her  (C.)  by  kicking  the  back  of  the  front
seat,  and  she  also  states  that  on  one  occasion  he  put  his  hand  on
her  knee  under  her  skirt,  but  it  is  entirely  apparent  from  the  testi-
mony  that  there  was  nothing  serious  about  either  of  these  trans-
actions  and  nothing  about  either  of  them  under  the  circumstances
which  proved  the  intention  to  have  sexual  intercourse.   With  ref-
erence  to  these  matters,  C.  testified:  "Out  by  the  Butte  he  kicked
me  in  the  back  with  the  seat.   I  was  sitting  in  the  front  and  he
kicked  the  seat.   From  the  time  we  left  the  Butte  and  until  he
quit  driving  we  got  along  nicely  and  our  relations  were  friendly,

and he never in any way mistreated me during that time. The only thing that occurred on this trip was that he put his hand on my knee under my skirt and used bad language. He did not·use bad language at the time he put his hand on my knee. Jack only used bad language at the Sly Hill and out at the Butte, those two occasions. The only things that occurred between me and Jack, he put his hand under my skirt on my knee and hugged me. I told him to take his hand away from my knee and he quit and never bothered again and he never said any insulting things to me. I told him that I did not·like that kind of attention and he desisted and treated me like a gentleman from that time on."

She also testified, with reference to the appellant Duffy putting his hand on her knee: "That is the only thing that occurred on that trip of that character. There was nothing worse than that and nothing stronger than that. I was with the other girl all the time from the time we started until Mr. and Mrs. R. came to Buffalo and nothing further occurred than the incident I have mentioned in my presence or hearing on the whole trip."

There is not in the record in this case a single syllable of evidence showing or tending to show that the appellants, or either of them, had sexual relations with either of the girls in question, or made any effort or attempt to have such relations, or requested either of the girls to indulge in any such relations. Indeed, the evidence of the state's own witnesses distinctly and affirmatively shows otherwise and is direct and positive to the effect that there was no such effort or attempt. If appellants took the girls in question with the intention of having sexual relations with them, they certainly had every opportunity to attempt or request such relations. Yet the record utterly fails to show that they did either, and on the contrary the testimony offered by the state affirmatively shows that nothing of the sort occurred.

Speaking of "intent" in connection with a charge of assault with intent to commit rape, the Supreme Court of North Carolina said, omitting citations:

"It must be established by evidence that does more than raise a mere suspicion, a conjecture or possibility, for 'evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it is so, is an insufficient foundation for a verdict, and should not be left to the jury.' * * *

There is no evidence in this case, in our opinion, from which a jury might reasonably come to the conclusion that the defendant intended to have carnal knowledge of the person of the prosecutrix, at all hazards and against her will. At most, the circumstances only raised a suspicion of his purpose, and therefore should not have been left to the consideration of the jury." State v. Massey, 86 N. C. 658, 41 Am. Rep. 478.

"It is therefore necessary that the acts and conduct of the prisoner should be shown to be such, that there can be no reasonable doubt as to the criminal intent. If these acts and conduct are equivocal, or equally consistent with the absence of the felonious intent charged in the indictment, then it is clear that they are insufficient to warrant a verdict of guilty." Commonwealth v. Merrill, 14 Gray (Mass.) 415, 77 Am. Dec. 336.

"But it must not only appear that the female was taken away or induced to leave through the active influence or persuasion of the accused, but it must also appear that it was done for the illicit purpose defined, and without such proof the prosecution must fail. * * * But notwithstanding the presence of some suspicious circumstances, in addition to the facts mentioned, we think the evidence altogether too slender to establish the guilt of the defendant. Whatever the truth may be, we think the state failed to sustain this charge by adequate proof. * * * The evidence in the case shows great moral depravity on the part of the defendant, but was insufficient, as we think, to establish the particular offense charged, and there must be a new trial." State v. Jamison, 38 Minn. 21, 35 N. W. 712.

The foregoing citations parallel the situation in the present case. On the point of intent we think, in the words of the Texas court (Lawrence v. State [Tex. Cr. App.] 32 S. W. 539), that "the proof is entirely of too flimsy a character to authorize a conviction for an offense of this grave character." We are cited to no case by the state, and we find none in our own investigations, where conviction for statutory abduction has been sustained upon so weak a showing as to the element of intent as is found in the present case. The conduct of the appellants was reprehensible in the extreme. Equally reprehensible was the conduct of the females in question, who were willing participants in the entire transaction, but it certainly cannot be said that the state proved beyond a rea-

sonable doubt that there was ever any specific intent on the part of the appellants, or either of them, to have sexual relations with either of these girls. To say, under the circumstances of this case and from the evidence here introduced, that appellants in fact intended to do anything more than they did, or anything different from what they did, is to depart from proof and to indulge an assumption that is flatly contradicted and rendered untenable by the testimony of the state's own witnesses. A conviction in a criminal case must rest upon a more substantial foundation.

If the evidence of the state is true the appellants in this case were guilty of other violations of law (including various violations of the intoxicating liquor law and perhaps the offense of contributory delinquency under R. C. 1919, §§ 10005-10013) and are doubtless deserving of punishment therefor, but that fact does not justify their conviction for the particular statutory crime of abduction in the face of an utter failure of proof upon the part of the state with reference to one of the essential elements of the crime.

The judgment and order appealed from are reversed.

MISER, C., sitting in lieu of BROWN, J., absent.

POLLEY, BURCH, and MISER, JJ., concur.

SHERWOOD, P. J. (dissenting). I dissent from two conclusions contained in the majority opinion. First, that the word, "debauch," as used in section 1 of chapter 1, Session Laws 1921, "is practically synonymous with the phrase, 'carnal knowledge.'" The statute under consideration, so far as applicable here, provides in substance that every person who takes any female under 18 years of age away from her father, mother, or other person having legal charge of her person "for the purpose of *debauchery, illicit relationship, concubinage, prostitution,* or *other immoral purpose,* is punishable by imprisonment in the state penitentiary not to exceed twenty years." (Underscoring mine.)

If the word "debauchery" as used in this statute is synonymous with the phrase "carnal knowledge," it is also synonymous with the phrase "sexual intercourse," because that is the meaning of the phrase "carnal knowledge." Webster's New International Dictionary. 9 C. J. 1923, and cases cited in notes 64 and 65, same page.

The phrase "illicit relationship," as used here, has the same

meaning as "illicit sexual intercourse." Majority opinion. Webster's New International Dictionary; 31 C. J. 244; State v. King, 9 S. D. 628, 70 N. W. 1046. Sexual intercourse is a crime only when it is illicit or forbidden. Hence, if the interpretation given to the word "debauch" by the majority of the court is correct as applied to this statute, the quoted part of the statute should read: "for the purpose of *'sexual intercourse,' 'illicit sexual intercourse,' 'concubinage,' 'prostitution,'* or *'other immoral purpose'* is punishable," etc. Such construction renders the statute absurd and the word, "debauchery" useless. Instead of four specific crimes which are denounced by this statute, the majority opinion has by interpretation reduced them to three.

Such a construction violates that elementary rule, which provides: "Effect is to be given, if possible, to every word, clause and sentence so as to make them consistent and harmonious and to give a sensible and intelligent effect to each." 36 Cyc. p. 1128, § 4b. The majority opinion construes the word "debauch" as it is construed in statutes where it is used in conjunction with the word "seduce," as "to secude and debauch." In this statute the word "debauchery" is used with an entirely different context and in apposition to the phrase "illicit relationship." It is a familiar rule that "words, phrases, and sentences of a statute are to be construed as used, not in an abstract sense, but with due regard to the context, and in that sense which best harmonizes with all other parts of the statute." 36 Cyc. p. 1131 (d). "The term debauchery is not a legal or technical term. To debauch is to corrupt in morals or principles; to lead astray morally into dishonest and vicious practices; to corrupt." Athanasaw and Sampson v. U. S., 227 U. S. 326, 33 S. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911. The ordinary meaning of the word "debauch" is "to lead away from purity and virtue; to corrupt in character." Webster's New International Dictionary.

It is also an elementary rule of construction that words in common use are to be construed in their natural, plain, and ordinary signficance. 36 Cyc. p 114, § 3. Construed according to these rules, the word "debauch" means, corrupting character. This would make the above quoted part of the statute read: "For the purpose of *corrupting character, illicit relationship, concubinage, prostitution,*" etc. This construction gives effect to every word in the stat-

ute; and gives to the word "debauch" its usual and ordinary meaning.

No authority has been cited in the majority opinion which construes the word "debauchery" when used in a statute or context similar to the one now under consideration. Therefore the authorities are not in point here.

On the second proposition: I think the state proved beyond a reasonable doubt that defendants took the girls with the intent to have sexual relations with them. It is true each girl testified neither defendant had sexual intercourse with her and as far as she knew did not have with the other girl. In addition to the statement in the original opinion I wish to call attention to some other facts also appearing from the record.

All the evidence of what occurred, in defendant's closed car, between 4 p. m. on the afternoon of July 19th, when the girls entered the car, and 1 p. m., on the afternoon of the 20th, when they reached Buffalo, was drawn, sometimes reluctantly, from the lips of the two girls who participated in that long night ride. Neither defendant gave any testimony. The girls were each just past 15 years of age. One was a school girl in Sturgis; the other, a girl from the country working as a domestic in that city. Neither of them had ever tasted intoxicating liquor until the defendants induced them to drink it on this trip.

The age of the men does not appear from the record, but it does appear that one of them owned the inclosed Jewett car in which they were riding; that he was taking the other defendant to Minneapolis to get a new car defendant Duffy had just bought; that defendant Maurer had been subpœnæd to be in Buffalo at 1 o'clock on the afternoon of July 20th, to be a witness in a sensational case there on trial; that the men were well acquainted with the country and the people and were able to cash their checks at several places along the way. Manifestly this was no school boy and girl escapade.

Defendants were mature business men dealing with 15-year-old girls. When the defendants invited the girls to ride, they knew they must be at Buffalo in Harding county, 104 miles away, at 1 o'clock the next day, and that they were going from there to Minneapolis to get Duffy's new car; nevertheless they promised to bring the girls back in half an hour. Instead they drove to a

signpost about two miles out of Sturgis, where Duffy knew a quart bottle of intoxicating liquor was hid in the bushes, obtained this bottle and induced the girls to take their first drink. After that they drove through some winding roads and fields to Newell, about 20 miles away. The first bottle of liquor being consumed, Duffy left the car and found in a nearby alfalfa field another quart bottle of intoxicating liquor. One of the girls testified she did not know which of the four drank the most of the liquor on the trip. Thereafter all agreed to go to Deadwood, about 40 miles away, to a dance. At Deadwood they danced twice; then went to Lead, where the men purchased a large bottle of hard cider which they mixed with the whisky. Defendants then drove back, and, having crossed the Sturgis road at least twice without turning toward Sturgis, they drove in an opposite direction from Sturgis, 104 miles, to Buffalo.

Between 4 and 5 o'clock the next morning, the liquor and hard cider being all consumed, defendants stopped at a road camp on the way and tried to get more liquor. They were unsuccessful there and went on to another road camp, where they obtained a jug (presumably a gallon) of whisky. They then drove on to Buffalo. Both girls testified defendants frequently used profane language; and one said: "They was cussing all the time." When pressed to give some of the exact language used by defendants to them, and in their presence, on the trip, they each related several words and phrases too low and vulgar to be printed, even by letter and dash; and said defendants used many more of similar character during the ride.

At Buffalo the girls began to inquire at the hotel how they could get back to Sturgis. This led to the hotel keeper's making an inquiry and later to their being turned over to the sheriff of Harding county, who kept them until the pursuing parents of one of the girls arrived, about 5:30 in the afternoon; whereupon the girls were turned over by the sheriff to them.

It appears from this record that one of the girls attempted to escape from the automobile on the trip, but was prevented from doing so by catching her arm and dress in the door of the car and Duffy's speeding up the car. During this episode Duffy said, "If you want to get rough, we can get rough," and called the girl the most vulgar and unprintable names. The C. girl testified that

on the way to Buffalo defendants said "they were going from Buffalo to Aberdeen and from Aberdeen to Minneapolis. Neither one of we girls wanted to go. We wanted to go back home because the folks would be worried. They did not seem to care whether the folks were worried or not. We said we did not have any clothes to make the trip to Aberdeen and Minneapolis. * * * One of them said we would get clothes and knickers and boots and sweaters at Buffalo."

The R. girl testified that as soon as Arthur Maurer was released from the trial at Buffalo, "We were excepting to start back as soon as the hearing was over. That was the arrangement that had been made. As soon as Art was released from the trial we would all start back." The C. girl said of their wait at Buffalo: "I did not know whether Art (Arthur Maurer) would come back from the courthouse or not. It is not true that we were expecting to return to the town of Sturgis that afternoon as soon as Art was released by the court, because they did not say anything about bringing us back to Sturgis. I did not know where they were going to take us. They said they were going to Minneapolis or Aberdeen."

The record also shows that during the trip defendants were making love to the girls, hugging and kissing them.

There is nothing consistent with an innocent or justifiable motive on the part of defendants in the record. The men took the girls for some purpose. Whether they meant to take them to Minneapolis or return them to Sturgis it is evident they expected to have them in their possession and control for at least one night after they left Buffalo.

This is not a case where a mere opportunity occurred for illicit relationship. It is a case where men deliberately planned to create an opportunity which would naturally lead to illicit intercourse. If the ruin of the girls was not accomplished the first night, this is no evidence it was not defendants' purpose to accomplish it before the girls were returned to Sturgis. That defendant Duffy removed his hand from under the girl's dress when she requested him to do so may be evidence that he did not intend to forcibly rape her. That he had his hand there at all was an insult and evidence that he was intending to have intercourse whenever he could gain her consent. It is common knowledge that plying young

girls with intoxicating liquor is the most potent known agency for blunting their moral sense and breaking down the guards which protect virtue.

It is commonly known that the automobile drive, the petting party, and the whisky flask are three of the most potent agencies known in securing the destruction of young girls. All these agencies were used by the defendants from the time they secured control of the girls until the girls were rescued by their parents, 24 hours later. By procurement of defendants and with no justifiable reason or excuse the girls spent the night with them alone, on a lonely road, and in a closed car. Such conduct furnishes sufficient proof to destroy the reputation of a woman for chastity. It is and ought to be strong evidence that the man intended that result.

In Athanasaw & Sampson v. U. S., supra, the statute was directed against the transportation of any woman or girl for the purpose of prostitution or debauchery, or any other immoral purpose. The defendant contended that the word, "debauchery," as used in the statute, meant "sexual intercourse."

The trial court instructed the jury: "You have heard the testimony in the case in regard to the circumstances in which she was placed. You have viewed the scene where she was employed. You have examined by the testimony and your observation what was the character and what was the condition or influence in which the girl was placed by the defendants. Was or was not it a condition that would necessarily and naturally lead to a life of debauchery of a carnal nature relating to sexual intercourse between man and woman?"

In reviewing this Mr. Justice McKenna said: "It is true that the court did not give to the word debauchery or to the purpose of the statute the limited definition and extent contended for by defendants, nor did the court make the guilt of the defendants to depend upon having the intent themselves to debauch the girls or to intend that someone else should do so. In the view of the court the statute had a more comprehensive prohibtion and was designed to reach acts which might ultimately lead to that phase of debauchery which consisted in sexual [intercourse]. * * * The plan and place justified the instruction; * * * The employment to which she was entised was an efficient school of debauchery." The judgment of conviction was affirmed.

It was not necessary that defendants ask these girls to have

sexual intercourse to show their intent. In a very similar case arising in Minnesota the court said: "During their ride the stranger made coarse advances to Lenora. * * * While there was no direct proposal of sexual intercourse, the things said and done were full of suggestions, and, considering them with the false personation, the misrepresentation, and the aimless driving about the country, there can be little doubt that he enticed Lenora from home for that immoral purpose. There is no other plausible explanation of his conduct. The jury's finding was to that effect, and it is sustained by the evidence." State v. Eckelberry, 153 Minn. 494, 191 N. W. 256.

In the instant case the men said they would bring the girls back in 30 minutes. They drove them about 200 miles back and forth with apparently no purpose except to keep them in their company, and they claimed to be driving under assumed names.

In People v. Claudius, 8 Cal. App. 597, 97 P. 687, the court said of similar evidence as to purpose: "To say that the conduct of the defendant in relation to this girl was not satisfactory evidence of the intent charged, notwithstanding the joint protest, would be to destroy the force of the established principle that one is conclusively presumed to contemplate the probable consequences of his own acts. The intent charged was a matter of fact which was for the jury to determine, and with their determination we are perfectly satisfied."

The following cases support this view: People v. Wah Lee Mon, 59 Hun, 626, 13 N. Y. S. 767; Weldon v. State, 165 Wis. 452, 162 N. W. 428; Weisiger v. Commonwealth, 215 Ky. 172, 284 S. W. 1039; Cowherd v. Commonwealth, 217 Ky. 475, 290 S. W. 348; State v. Martin, 28 N. M. 489, 214 P. 575; State v. Eckelberry, 153 Minn. 494, 191 N. W. 256; State v. Lauzer, 152 Minn. 279, 188 N. W. 558; People v. Spriggs, 119 App. Div. 236, 104 N. Y. S. 539.

In the instant case the jury and the trial court saw both defendants. They also saw the girls and observed the manner in which they gave their testimony. This court has not seen the defendants nor the girls and had no opportunity to observe the manner in which they gave testimony. The testimony of the girls is in some important particulars conflicting. In my view the evidence fully sustains the verdict, and the judgment and order appealed from should be affirmed.